GW/JRS:MGD/MM
F. #2021R00994

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
* JUNE 17, 2025 *
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JOSEPH TONY BROWN-ARKAH,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

SUPERSEDING
I N D I C T M E N T

Cr. No. 24-293 (S-1) (FB)
(T. 18, U.S.C., §§ 982(a)(7), 982(b)(1),
1347, 1349, 2 and 3551 et seq.; T. 21,
U.S.C., §§ 841(a)(1), 841(b)(1)(E),
846, 853(a) and 853(p))

THE GRAND JURY CHARGES:

## INTRODUCTION

        At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    Background

    A.    The Medicare and Medicaid Programs

        1.      The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

        2.      The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program

in participating states, including New York.   Individuals who received benefits under Medicaid were referred to as Medicaid "recipients."

3.  Medicare and Medicaid each qualified as a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

4.  Medicare included coverage under various parts including medical insurance ("Medicare Part B") and prescription drug insurance ("Medicare Part D").   Medicare Part B covered the costs of physicians' services and outpatient care, including addiction treatment.   Medicare Part D provided prescription drug coverage to persons who were eligible for Medicare.   Generally, Medicare covered these costs only if, among other requirements, they were medically necessary and ordered by a licensed medical provider.

5.  Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid was addiction treatment.   Generally, Medicaid covered these costs only if, among other requirements, they were medically necessary and ordered by a licensed medical provider.

6.  Medicaid recipients could obtain their medical services and prescription drug benefits either through "fee-for-service" enrollment or through Medicaid Managed Care plans, which were administered by private insurance companies (Managed Care Organizations, or "MCOs") that were paid by Medicaid.

7.  HHS was required to exclude any individual or entity from participating in all federal health care programs upon conviction for certain crimes, including a criminal offense related to the delivery of an item or service under Medicare, Medicaid or any state health care program, or a felony conviction related to health care fraud or controlled substances.

8.    The effect of exclusion was to prohibit the payment by any federal health care program, including Medicare and Medicaid, for any items or services the excluded person or entity furnished, ordered, or prescribed in any capacity. Excluded persons were also prohibited from furnishing administrative and management services, including health information technology services, strategic planning, billing and human resources, even if the services did not directly involve patient care or the provision of any health care related services.

9.    Medical providers were authorized to submit claims to Medicare and Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services were rendered to the patient, were medically necessary, were not rendered as a result of kickbacks and bribes and were not otherwise ineligible for payment, such as claims for services furnished, ordered or prescribed by an excluded provider. Medicare and Medicaid did not reimburse for services that were medically unnecessary, rendered as a result of kickbacks and bribes or furnished, ordered or prescribed by an excluded provider.

10.    Medicare and Medicaid covered prescriptions for controlled substances, including buprenorphine, a medication designed to treat patients with opioid use disorder, that were obtained from a state-licensed physician, or other appropriately licensed health care provider, who was registered as required with the Drug Enforcement Administration ("DEA"). Medicare and Medicaid required that any drug prescribed by a participating provider must be safe and effective and otherwise reasonable and necessary and would only reimburse for claims for prescriptions that were prescribed within the usual course of professional practice and for a legitimate medical purpose. Medicare and Medicaid required that prescriptions were written within the usual course of professional practice and for a legitimate medical purpose.

B.     The Controlled Substances Act

11.     The Controlled Substances Act ("CSA"), Title 21, United States Code, Section 841(a) et seq., and Title 21, Code of Federal Regulations, Section 1306.04, governed the manufacture, distribution and dispensation of controlled substances in the United States.   With limited exceptions for medical professionals, the CSA made it unlawful for any person to knowingly or intentionally manufacture, distribute or dispense a controlled substance or conspire to do so.

12.     The term "controlled substance" meant a drug or other substance, or immediate precursor, included in Schedules I, II, III, IV and V, as designated by Title 21, United States Code, Section 802(c)(6), and the Code of Federal Regulations.   The designation "Schedule III" meant the drug or other substance had a moderate to low potential for physical and psychological dependence and had less abuse potential than Schedule I or Schedule II substances but more than Schedule IV substances.

13.     Buprenorphine was a Schedule III controlled substance.   Buprenorphine was marketed in the United States as, among other things, Suboxone.

14.     Medical practitioners, such as nurse practitioners and physicians, who were authorized to prescribe controlled substances by the jurisdiction in which they were licensed to practice medicine, were authorized under the CSA to prescribe, or otherwise distribute, controlled substances, if they were registered with the Attorney General of the United States.   21 U.S.C. § 822(b); 21 C.F.R. § 1306.03.   Medical practitioners were required to register with the DEA in order to prescribe controlled substances.   The registration of mid-level practitioners, such as nurse practitioners, was contingent upon the authority granted by the state in which they were licensed.   Upon application by the practitioner, the DEA assigned a unique

registration number to each qualifying medical practitioner. The DEA was responsible for enforcement of controlled substance laws in the United States.

        15.    To be effective, a prescription for a controlled substance was required to be "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

        C.     Buprenorphine and the DATA Waiver Program

        16.    Pursuant to the Drug Addiction Treatment Act of 2000 ("DATA") and accompanying rules and regulations, the Substance Abuse and Mental Health Services Administration ("SAMHSA"), a federal agency under HHS, issued special licenses to those DEA-licensed medical professionals who wished to prescribe buprenorphine to treat opioid use disorder. These licenses, known as "DATA waivers," permitted qualified practitioners, including nurse practitioners, to dispense or prescribe buprenorphine in clinic settings. Practitioners who did not possess a DATA waiver could not prescribe buprenorphine, even if they maintained a license issued by the DEA to prescribe controlled substances.

        17.    In order to receive a DATA waiver, practitioners were required to have a DEA registration number and complete 24 hours of additional training. The DEA assigned special identification numbers to practitioners who received DATA waivers.

        18.    Rules and regulations and policies pertaining to DATA waivers, including but not limited to those rules and regulations enforced by SAMHSA and the DEA, required that DATA-waived practitioners who prescribed buprenorphine assess patients in connection with prescribing the medication in order to ascertain whether the medication was appropriate for the patient's medical condition. Prior to 2020, certain such assessments were required to be in

person.   After the COVID-19 pandemic began, the required assessments could take place by means of telemedicine.

D.   The Defendants and Relevant Individuals and Entities

19.   American Medical Utilization Management Corporation, doing business as AMUMC / American Medical Centers (together, "AMC" or the "Clinic"), was a medical clinic that operated in Brooklyn, New York.   AMC purported to offer a variety of services including, but not limited to, primary care, women's health, non-addictive pain management, laboratory testing, podiatry services, physical therapy and obesity treatment.

20.   The defendant JOSEPH TONY BROWN-ARKAH was a resident of the State of New York and was the owner of AMC.   BROWN-ARKAH was not a medical practitioner and was not licensed to prescribe medications or order diagnostic tests.

21.   Evens Jean was a resident of the State of New York until approximately June 2020 and thereafter of the State of Florida, and a licensed nurse practitioner.   Beginning in or about June 2019, Jean was a DATA-waived practitioner.   Jean was employed by or affiliated with AMC between approximately 2019 and 2023.

22.   Co-Conspirator-1, an individual whose identity is known to the Grand Jury, was a resident of the State of New York and a licensed podiatrist.   Co-Conspirator-1 was employed by AMC between approximately 2003 and 2023.   Co-Conspirator-1 was convicted in 2016 of conspiracy to distribute oxycodone, in violation of Title 21, United States Code, Sections 846 and 841.   Although Co-Conspirator-1 remained a licensed medical practitioner after conviction, Co-Conspirator-1 no longer had a license to prescribe controlled substances and was excluded from serving as a provider by Medicare and Medicaid.

23.     Provider-1, an individual whose identity is known to the Grand Jury, was a licensed medical practitioner who worked at AMC until approximately 2022.

24.     MCO-1, an entity the identity of which is known to the Grand Jury, was a Medicaid MCO that insured Medicaid recipients in New York.

25.     MCO-2, an entity the identity of which is known to the Grand Jury, was a Medicaid MCO that insured Medicaid recipients in New York.

26.     Individual-1, an individual whose identity is known to the Grand Jury, was a patient at AMC who was prescribed buprenorphine by Jean.   Individual-1 was insured at various times by MCO-1 and MCO-2.

27.     Individual-2, an individual whose identity is known to the Grand Jury, was a patient at AMC who was prescribed buprenorphine by Jean.   Individual-1 was insured by MCO-2.

II.     The Fraudulent Scheme and Unlawful Distribution of Controlled Substances

28.     Between approximately January 2020 and March 2023, the defendant JOSEPH TONY BROWN-ARKAH, together with Jean, Co-Conspirator-1 and others, submitted and caused the submission of false and fraudulent claims to health care benefit programs, including Medicare and Medicaid, for health care services that were not provided, not provided as billed, provided by an excluded provider and/or otherwise ineligible for reimbursement. BROWN-ARKAH, Jean, Co-Conspirator-1 and others also unlawfully prescribed and caused the prescription of controlled substances that were not for a legitimate medical purpose in the usual course of professional practice, including but not limited to buprenorphine, which prescriptions resulted in claims to Medicare and Medicaid.

A.    The Fraudulent Buprenorphine Prescriptions

29.    In or about October 2019, the defendant JOSEPH TONY BROWN-

ARKAH hired Jean to prescribe buprenorphine to patients at AMC. Between approximately

November 2019 and December 2019, Jean worked on the premises of AMC and prescribed

buprenorphine, among other things, to patients at AMC. In or about January 2020, Jean took a

job at another medical clinic, and in or about June 2020, Jean moved to Florida. After Jean

ceased working on the premises of AMC in or about January 2020, he rarely, if ever, interacted

with AMC patients.

30.    The defendant JOSEPH TONY BROWN-ARKAH, Jean, Co-Conspirator-

1 and others agreed that Jean would continue to prescribe buprenorphine and other medications

to, as well as order urine drug screening and other laboratory tests for, AMC's patients even after

he ceased working for AMC in or about January 2020 and while he was not interacting with

AMC patients. During this time, BROWN-ARKAH knew that Jean was working at a different

medical clinic and, as of June 2020, was living permanently in Florida and was not physically

present at AMC or conducting telemedicine with its patients. Between approximately January

2020 and March 2023, Jean unlawfully prescribed and ordered, and permitted his co-conspirators

to prescribe and order using his own credentials, buprenorphine and other medications, as well as

urine drug screening and other laboratory tests, for AMC's patients.

31.    At the direction of the defendant JOSEPH TONY BROWN-ARKAH, Co-

Conspirator-1 met with patients in person at AMC and entered notes of those meetings into

AMC's electronic medical records ("EMR") system. Co-Conspirator-1's notes indicated,

among other things, that buprenorphine and sometimes other prescription medications and items

should be prescribed to the patients even though Co-Conspirator-1 was not lawfully permitted to

prescribe them. Co-Conspirator-1 would then contact Jean to inform him that the patients were waiting for prescriptions. After Co-Conspirator-1 alerted Jean to the need for the prescriptions, Jean used the EMR system to send prescriptions for buprenorphine and other medications to patients' pharmacies, without conducting any interaction with the patients or validly determining their medical need for the prescriptions.

32.     On days when Co-Conspirator-1 did not work at AMC, patients would still come to AMC for prescriptions but would generally not see a medical provider. Instead, other individuals at AMC, including but not limited to the defendant JOSEPH TONY BROWN-ARKAH, would notify Jean that patients were waiting for their prescriptions. Jean would then issue the requested prescriptions, including for buprenorphine. On some such occasions, BROWN-ARKAH also directed Jean to increase the amount of buprenorphine prescribed to patients with whom Jean did not consult. On others, BROWN-ARKAH directed Jean to change the type of medication previously prescribed.

33.     Patients typically received urine drug screenings and, at times, other laboratory tests in connection with each visit to AMC. As with the prescriptions for buprenorphine and other medications and items, the urine drug screenings and other laboratory tests were improperly prescribed in connection with a patient's meetings with Co-Conspirator-1, who was excluded from Medicare and Medicaid, or without ever meeting with a licensed medical professional.

34.     It was part of the defendants' criminal scheme that by prescribing buprenorphine to patients without first interacting with the patients and without making an independent assessment of patients' need for buprenorphine, Jean would knowingly and

intentionally prescribe buprenorphine that was not for a legitimate medical purpose in the usual course of professional practice.

B.    The Fraudulent Buprenorphine-Related Claims to Medicare and Medicaid

35.    The pharmacies to which Jean sent prescriptions for buprenorphine and other items billed Medicare and Medicaid, including but not limited to Medicaid MCOs, for dispensing the prescribed items.   In total, between approximately January 2020 and March 2023, these pharmacies billed Medicare and Medicaid approximately $8,201,761.60, and were paid approximately $7,677,663.77, for prescription medications and other items prescribed by Jean, including but not limited to approximately 980,611 doses of buprenorphine.   These claims were false and fraudulent because, among other reasons, they (a) stemmed from services furnished, ordered or prescribed by an excluded provider, (b) were prescribed at the behest of individuals who were not licensed medical providers, including but not limited to the defendant JOSEPH TONY BROWN-ARKAH, and (c) sought reimbursement for controlled substances prescribed without a legitimate medical purpose in the usual course of professional practice.

36.    It was part of the scheme that patients at AMC would undergo urine drug screening and laboratory tests, generally in connection with a meeting with Co-Conspirator-1 but sometimes without seeing any medical provider at all.   The urine drug screening and laboratory tests were subsequently billed to Medicare and Medicaid.   These claims were false and fraudulent because, among other reasons, they (a) stemmed from services furnished, ordered or prescribed by an excluded provider, (b) were conducted at the behest of individuals who were not licensed medical providers, including but not limited to the defendant JOSEPH TONY BROWN-ARKAH, and (c) sought reimbursement for services that were medically unnecessary and were provided outside the course of regular medical practice absent the exercise of valid

medical judgment. Between approximately January 2020 and March 2023, Medicare and Medicaid were billed approximately $68,541,155.79 for urine drug screening and laboratory tests conducted on AMC patients who were concurrently prescribed buprenorphine by Jean.

37.    It was further part of the scheme that, under the direction of the defendant JOSEPH TONY BROWN-ARKAH, AMC staff would bill Medicare and Medicaid for office-based services that were ineligible for reimbursement. In particular, after patients visited AMC and received buprenorphine prescriptions from Jean, AMC staff typically drafted false and fraudulent medical notes memorializing the purported services and submitted claims for office visits and addiction-related counseling to the patients' insurance companies, including Medicare and Medicaid. The claims were typically billed under the name of Provider-1, even though Provider-1 had not met with the patients. In reality, the patients had either met with Co-Conspirator-1, whose services could not legally be billed to Medicare and Medicaid, or, on some occasions, no medical provider at all. The claims were therefore false and fraudulent.

38.    In or about and between February 2022 and May 2022, Individual-1 was repeatedly prescribed buprenorphine by Jean despite never meeting or speaking with Jean. In total, Individual-1 received buprenorphine prescribed by Jean approximately four times. On each occasion, Individual-1's insurers, MCO-1 and MCO-2, were billed for multiple false and fraudulent claims, including office visits, counseling and urine drug screening, as well as the buprenorphine itself. For example:

(a)    On or about February 16, 2022, Individual-1 met with Co-Conspirator-1 for approximately eight minutes and was subsequently prescribed buprenorphine by Jean. Individual-1 did not meet with Jean or any other practitioner at AMC. AMC, however, submitted two false and fraudulent claims to MCO-1 under the name of Provider-1 for

Individual-1's February 16, 2022 visit: (i) an established patient office visit of 20 to 29 minutes; and (ii) a 15-minute preventive medicine counseling session. Individual-1's pharmacy thereafter submitted a claim to MCO-1 for dispensing the buprenorphine, which was false and fraudulent because, among other reasons, the buprenorphine was not validly prescribed.

(b)     On or about March 23, 2022, Individual-1 went to AMC and told Co-Conspirator-1 and the defendant JOSEPH TONY BROWN-ARKAH, in sum and substance, that Individual-1 would not stay for an appointment that day. Co-Conspirator-1 replied, in sum and substance, that a buprenorphine prescription would be sent to Individual-1's pharmacy. Individual-1 was subsequently prescribed buprenorphine by Jean. AMC submitted two false and fraudulent claims to MCO-1 under the name of Provider-1 for Individual-1's March 23, 2022 visit: (i) an established patient office visit of 20 to 29 minutes; and (ii) a 15-minute preventive medicine counseling session. Individual-1's pharmacy thereafter submitted a claim to MCO-1 for dispensing the buprenorphine, which was false and fraudulent because, among other reasons, the buprenorphine was not validly prescribed.

(c)     On or about April 20, 2022, Individual-1 met with BROWN-ARKAH and was subsequently prescribed buprenorphine by Jean. AMC submitted two false and fraudulent claims to MCO-2 under the name of Provider-1 for Individual-1's April 20, 2022 visit: (i) an established patient office visit of 20 to 29 minutes; and (ii) a 15-minute preventive medicine counseling session. Individual-1's pharmacy thereafter submitted a claim to MCO-2 for dispensing the buprenorphine, which was false and fraudulent because, among other reasons, the buprenorphine was not validly prescribed.

39.     On or about May 26, 2022, Individual-2 met with Co-Conspirator-1 at AMC. Individual-2 subsequently received buprenorphine prescribed by Jean despite having

never met or spoken with Jean.   Individual-2's pharmacy thereafter submitted a claim to MCO-2 for dispensing the buprenorphine, which was false and fraudulent because, among other reasons, the buprenorphine was not validly prescribed.

      C.     <u>The Fraudulent Diagnostic Tests and Related Claims to Medicare and Medicaid</u>

      40.     The defendant JOSEPH TONY BROWN-ARKAH additionally carried out a fraudulent scheme in which he referred patients at AMC for diagnostic tests that were ineligible for payment by Medicare and Medicaid because they were (a) medically unnecessary; (b) were furnished, ordered or prescribed by an excluded provider; (c) were not validly ordered by a licensed medical provider; or (d) were not provided as represented or were not provided at all.   The fraudulent diagnostic tests included, but were not limited to, cardiac tests, autonomic nervous system tests, respiratory tests and allergy tests.   Between approximately January 2020 and March 2023, Medicare and Medicaid were billed approximately $8,674,613.04, and paid $2,243,694.12, in connection with these false and fraudulent diagnostic test claims.

      41.     In particular, patients at AMC were directed by the defendant JOSEPH TONY BROWN-ARKAH, as well as others working at his direction, to submit to diagnostic tests in connection with their visits to the Clinic.   Frequently those diagnostic tests were carried out before the patient had seen any medical provider during that visit, or when the patients had seen only Co-Conspirator-1, who was excluded from Medicare and Medicaid and was thus unauthorized to refer patients for diagnostic tests.   Other diagnostic tests were conducted on Provider-1's patients without Provider-1's authorization, at times being added to otherwise-valid orders issued by Provider-1 and at other times being conducted prior to patients' meetings with Provider-1.   In addition, some of the diagnostic tests were either not conducted at all, or not conducted in the manner billed.   For example:

(a)    At the conclusion of the April 20, 2022 meeting between Individual-1 and BROWN-ARKAH, BROWN-ARKAH directed Individual-1 to follow another individual at the Clinic.   Individual-1 then received purported cardiac and respiratory tests without having seen any medical provider during that visit.   Diagnostic testing companies subsequently submitted a number of false and fraudulent claims to MCO-2, including: (i) a bronchodilation test that involved an initial breathing test, the administration of a bronchodilating medication, a waiting period and then a second breathing test; and (ii) the review of a 30-day record of self-administered breathing tests.   In reality, no such test was administered, and no such record was kept or provided to any medical provider by Individual-1; nor were any of the diagnostic tests for which claims were submitted validly ordered by a medical practitioner.

(b)    On May 26, 2022, upon registering as a new patient at AMC, and prior to meeting with Co-Conspirator-1 or any other medical provider, Individual-2 was directed by Clinic staff to submit to purported cardiac and respiratory tests.   Diagnostic testing companies subsequently submitted a number of false and fraudulent claims to MCO-2, including: (i) a percutaneous allergy test; and (ii) the review of a 30-day record of self-administered breathing tests.   In reality, no such test was administered, and no such record was kept or provided to any medical provider by Individual-2; nor were any of the diagnostic tests for which claims were submitted validly ordered by a medical practitioner.

42.    The defendant JOSEPH TONY BROWN-ARKAH, as well as other individuals working at AMC working at BROWN-ARKAH's behest, indicated to patients and others that if patients refused to submit to diagnostic tests, they would not receive their prescriptions for buprenorphine.

## COUNT ONE
(Conspiracy to Commit Health Care Fraud)

43. The allegations in paragraphs one through 42 are realleged and incorporated as if fully set forth in this paragraph.

44. In or about and between January 2020 and March 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did knowingly and willfully conspire to execute a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code, Section 24(b), to wit: Medicare and Medicaid, and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS TWO THROUGH NINE
(Health Care Fraud – Buprenorphine-Related Claims)

45. The allegations contained in paragraphs one through 42 are realleged and incorporated as if fully set forth in this paragraph.

46. In or about and between January 2020 and March 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code, Section 24(b), to wit: Medicare and Medicaid, and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control

of, Medicare and Medicaid, in connection with the delivery of and payment for health care

benefits, items and services, to wit: prescription medication, urine drug screening and other

laboratory tests, and office-based services.

47.    On or about the dates specified below, within the Eastern District of New

York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did

submit and cause to be submitted the following false and fraudulent claims to MCO-1 and MCO-

2, in an attempt to execute, and in execution of, the scheme described above:

| Count | Approx. Date of Claim | Description |
|---|---|---|
| TWO | February 16, 2022 | Claim for buprenorphine submitted and billed to MCO-1 in the approximate amount of $506.55 in connection with a false and fraudulent prescription issued to Individual-1 |
| THREE | March 23, 2022 | Claim for buprenorphine submitted and billed to MCO-1 in the approximate amount of $252.36 in connection with a false and fraudulent prescription issued to Individual-1 |
| FOUR | April 20, 2022 | Claim for buprenorphine submitted and billed to MCO-2 in the approximate amount of $196.19 in connection with a false and fraudulent prescription issued to Individual-1 |
| FIVE | June 8, 2022 | Claim for buprenorphine submitted and billed to MCO-2 in the approximate amount of $93.35 in connection with a false and fraudulent prescription issued to Individual-2 |
| SIX | April 2, 2022 | Claim for office visit submitted and billed to MCO-1 in the approximate amount of $275.00 in connection with Individual-1, for a March 23, 2022 date of service |
| SEVEN | April 2, 2022 | Claim for counseling services submitted and billed to MCO-1 in the approximate amount of $100.00 in connection with Individual-1, for a March 23, 2022 date of service |
| EIGHT | April 29, 2022 | Claim for office visit submitted and billed to MCO-2 in the approximate amount of $275.00 in connection with Individual-1, for an April 20, 2022 date of service |

| Count | Approx. Date of Claim | Description |
|-------|----------------------|-------------|
| NINE | April 29, 2022 | Claim for counseling services submitted and billed to MCO-2 in the approximate amount of $100.00 in connection with Individual-1, for an April 20, 2022 date of service |

(Title 18, United States Code, Sections 1347, 2 and 3551 et seq.)

COUNTS TEN THROUGH THIRTEEN
(Health Care Fraud – Diagnostic Tests)

48.     The allegations contained in paragraphs one through 42 are realleged and incorporated as if fully set forth in this paragraph.

49.     In or about and between January 2020 and March 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and Medicaid, and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare and Medicaid, in connection with the delivery of and payment for health care benefits, items and services, to wit: diagnostic testing.

50.     On or about the dates specified below, within the Eastern District of New York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did submit and cause to be submitted the following false and fraudulent claims for diagnostic testing to MCO-1 and MCO-2, in an attempt to execute, and in execution of, the scheme described above:

| Count | Approx. Date of Claim | Description |
|---|---|---|
| TEN | May 19, 2022 | Claim for bronchodilation responsiveness, spirometry, pre- and post-bronchodilator administration, submitted and billed to MCO-2 in the approximate amount of $150.00 in connection with Individual-1, with an April 20, 2022 date of service |
| ELEVEN | May 19, 2022 | Claim for review of patient-initiated spirometric recording, 30 days, submitted and billed to MCO-2 in the approximate amount of $50.00 in connection with Individual-1, with an April 20, 2022 date of service |
| TWELVE | July 28, 2022 | Claim for percutaneous test with allergenic extracts, immediate type reaction, submitted and billed to MCO-2 in the approximate amount of $600.00 in connection with Individual-2, with a May 26, 2022 date of service |
| THIRTEEN | July 28, 2022 | Claim for review of patient-initiated spirometric recording, 30 days, submitted and billed to MCO-2 in the approximate amount of $50.00 in connection with Individual-2, with a May 26, 2022 date of service |

(Title 18, United States Code, Sections 1347, 2 and 3551 et seq.)

## COUNT FOURTEEN
(Conspiracy to Distribute Buprenorphine)

51.     The allegations in paragraphs one through 42 are realleged and incorporated as if fully set forth in this paragraph.

52.     In or about and between January 2020 and March 2023, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did knowingly and intentionally conspire to distribute and dispense controlled substances through prescriptions that were not issued for a legitimate medical purpose by a practitioner acting within the usual course of

professional practice, to wit: buprenorphine, a Schedule III controlled substance, contrary to

Title 21, United States Code, Section 841(a)(1).

(Title 21, United States Code, Sections 846 and 841(b)(1)(E); Title 18, United

States Code, Sections 3551 et seq.)

## COUNTS FIFTEEN THROUGH SEVENTEEN
(Distribution of Buprenorphine)

53. The allegations in paragraphs one through 42 are realleged and

incorporated as if fully set forth in this paragraph.

54. On or about the dates specified below, within the Eastern District of New

York and elsewhere, the defendant JOSEPH TONY BROWN-ARKAH, together with others, did

knowingly and intentionally distribute and dispense controlled substances through prescriptions

that were not issued for a legitimate medical purpose by a practitioner acting within the usual

course of professional practice, to wit: buprenorphine, a Schedule III controlled substance, as set

forth below:

| Count | Approx. Date | Description |
|---|---|---|
| FIFTEEN | February 16, 2022 | Buprenorphine prescription issued to Individual-1 |
| SIXTEEN | March 23, 2022 | Buprenorphine prescription issued to Individual-1 |
| SEVENTEEN | April 20, 2022 | Buprenorphine prescription issued to Individual-1 |

(Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E); Title 18,

United States Code, Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
AS TO COUNTS ONE THROUGH THIRTEEN

55. The United States hereby gives notice to the defendant that, upon his

conviction of any of the offenses charged in Counts One through Thirteen, the government will

seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offenses.

      56.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

      (Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United States Code, Section 853(p))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS FOURTEEN THROUGH SEVENTEEN

      57.    The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts Fourteen through Seventeen, the government will seek forfeiture in accordance with Title 21, United States Code, Section 853(a), which requires any person convicted of such offenses to forfeit: (a) any property constituting, or

derived from, any proceeds obtained directly or indirectly as the result of such offenses; and

(b) any property used, or intended to be used, in any manner or part, to commit, or to facilitate

the commission of, such offenses.

58.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 21, United States Code, Sections 853(a) and 853(p))

A TRUE BILL

/s/
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
FOREPERSON

*By David Pitluck, Asst. U.S. Attorney*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
JOSEPH NOCELLA, JR.
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE